

1ST CIRCUIT COURT
STATE OF HAWAII
FILED

2005 FEB -7 PM 2: 46

M. LIVICA
CLERK

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI`I

| | |
|---|---|
| ASSOCIATION OF APARTMENT OWNERS OF HANOHANO HALE, | CIVIL NO. 99-1122-03 (BIA) (Other Civil Action) |
| Plaintiff, | |
| and | |
| ASSOCIATION OF APARTMENT OWNERS OF PAT'S AT PUNALUU, | |
| Applicant for Intervention, | |
| vs. | |
| UNITY HOUSE, INCORPORATED, HANOHANO ENTERPRISES, INCORPORATED AND SARAI ANN KALAI HANOHANO VAHEY, | |
| Defendants. | |
| UNITY HOUSE, INCORPORATED, | Civil No. 99-2545-07 (Foreclosure) |
| Plaintiff, | |
| vs. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| HANOHANO ENTERPRISES, INCORPORATED; SARAI ANN KALAI HANOHANO VAHEY; THE HANOHANO | |

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit



EXHIBIT ___B___

```
FAMILY, INC. AND DOES 1-50,      )
                                 )
              Defendants,        )
                                 )
         and                     )
                                 )
ASSOCIATION OF APARTMENT         )
OWNERS OF PAT'S AT PUNALUU,      )
                                 )
              Intervenor.        )
_____)
```

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On August 5, 2004, this Court conducted a non-jury trial in Civil Nos. 99-1122 and 99-2545, both of which were previously consolidated. All evidence admitted at trial was stipulated into evidence by the appearing parties. At issue in the trial were the redemption price of the property securing the mortgage loan in Civ. No. 99-2545 (foreclosure action) and the time period in which the redemption price had to be paid. Based upon the evidence admitted, the memoranda and arguments of counsel, and the records and files in both civil cases, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1.  From 1969 until 2000, Robert ("Bobby") Hanohano was the President of Hanohano Enterprises, Incorporated (HEI).

2.  Peter Hanohano (aka Kauhola) was Bobby's older brother, by 12 years. After 17 years in the Orient as an

international finance broker, Peter had moved back to Hawaii in the mid 1980s and owned a business called Unique Financing. Peter lived at Pat's at Punaluu, as Bobby did, and shared an office with Bobby, at which Peter conducted his business in international financing, mortgages, and personal loans.

3.   Bobby relied on Peter's business acumen throughout the 1997 and 1998 transactions between Unity House, Inc.; Hanohano Enterprises, Inc. (HEI), The Hanohano Family, Inc. (HFI) and Sarai, Ann Kalai Hanohano Vahey (Vahey) (collectively, HEI, HFI and Vahey are "the Hanohanos" or "the Hanohano family"); Norman Frank, Capitol Resources International, Ltd. ("Capitol Resources") and Trans Oceanic International, Ltd. ("Trans Oceanic"), and until Peter's death in December 2000.

4.   Bobby and Peter were the only representatives of the Hanohano family to have direct dealings with Unity House regarding the transactions involved in this lawsuit.

5.   From the Hanohanos' point of view, the whole transaction with Unity House, Inc. originated when a woman named Flo Delavega approached Peter to get help from HEI for Norman Frank, so that he could get a loan from Unity House. Unity House was requesting real estate to secure the loan.

6.   At that time, Bobby knew of Norman Frank because his nephew dated Mr. Frank's daughter. He also knew that Mr. Frank had been a policeman at some point in his career.

7.   At that time, HEI was about $1 million in debt.  It owed Central Pacific Bank $500,000 and it owed Oahu Restaurant Supply $480,000 (for work on the Pat's at Punaluu Restaurant). The Central Pacific Bank loan was secured by a mortgage.  All of the Hanohanos' properties that were later pledged as collateral to secure repayment of the loan from Unity House were pledged as collateral to secure the Central Pacific Bank loan.

8.   The Hanohanos had been making the mortgage payments to Central Pacific Bank from the proceeds of the lease rents they were receiving from the Hanohano Hale and Pat's at Punaluu condominium properties.

9.   Then the Hanohanos used those funds toward the remodeling and renovation of the restaurant at Pat's at Punaluu.

10.   This caused the Hanohanos to go into default on the Central Pacific Bank mortgage, and at the time they entered into the transaction with Unity House, Inc. they were four months in arrears on those payments.

11.   Before speaking with Unity House, Bobby Hanohano endeavored to find traditional sources of financing to meet HEI and Hanohano family financial needs, through Central Pacific

4

Bank and through American Savings Bank.  Those requests for
funds had been turned down because the Hanohanos insisted on
including investing in the restaurant as part of the
transaction, and the banks felt that the restaurant business was
a risky business.

12.  Had the Hanohanos foregone reopening the restaurant
and operating a small convenience store on the premises at Pat's
at Punaluu, they could probably have obtained conventional
financing for a loan of $1 million, which would have been enough
to pay the $500,000 owed to Central Pacific Bank and the
$480,000 owed to Oahu Restaurant Supply.  The Hanohanos chose
not to do that because Bobby is an entrepreneur who likes to
venture into projects.

13.  Despite the lack of conventional financing, HEI did
have options other than seeking a loan from Unity House.  HEI's
equity in the properties that it put up as collateral for the
loan from Unity House was many times more than the amounts owed
to Central Pacific Bank and Oahu Restaurant Supply.  One option
was that HEI could have sold a portion of its holdings, paid all
outstanding debts, and still have had substantial monies and
land assets left over.  These monies would have been more than
sufficient to pay all debts associated with the properties,
including all liens ultimately satisfied out of the proceeds of

5

the loan, which, including the loan from Central Pacific Bank, totaled approximately $1,027,000.

14.  The Hanohanos' intent was to get a mortgage, get out of debt and get the restaurant operating.

15.  When Peter Hanohano addressed the HEI board about helping Mr. Frank obtain a loan from Unity House, Bobby saw it as an opportunity for HEI itself to get some of the loan proceeds.  Bobby raised that with Peter and asked him to go back to Norman Frank with that proposal.

16.  After Peter initially spoke to the HEI Board and to Mr. Frank, it was Bobby who did most of the talking to them. Bobby's plan was to use HEI's share of the loan proceeds to get out of debt and to finish the work on the restaurant to get it up and running (at no ultimate cost to HEI, which would get the money back from Frank).

17.  Peter Hanohano introduced Norman Frank to Bobby Hanohano, who knew of Mr. Frank, but had not previously met him.

18.  Capitol Resources International, Limited, was Norman Frank's company.  That company was going to be the borrower, but then it changed to Trans Oceanic.

19.  Bobby Hanohano knew that Unity House would not loan money directly to Mr. Frank because Unity House had concerns about Frank's proposed deal and about Frank's ability to repay

6

any loan. He was not under the impression that Unity House refused a direct loan to Mr. Frank due to procedural or legal reasons.

20. Norman Frank told Bobby Hanohano that he would repay all monies owed by the Hanohanos to Unity House, Inc. as a result of the transaction from an $80 million line of credit. Besides paying back the $1.7 million he was to receive from the loan proceeds, Mr. Frank agreed to pay the entire balance due Unity House within the specified time limits.

21. It was Bobby Hanohano's understanding that Mr. Frank needed the loan to activate the line of credit.

22. At the time HEI entered into the transaction with Unity House, Bobby Hanohano knew that Norman Frank was under federal indictment.

23. Bobby Hanohano informed the HEI Board that Norman Frank was being investigated by the Federal government, as well as information from his discussion with William Hanohano regarding Norman Frank's prior deals, which William was severely critical of. The Board felt that William had a personal grudge or assisted his wife in a personal grudge against Mr. Frank.

24. Bobby Hanohano always led HEI and HFI with the aid of spiritual guidance, pursuant to deeply held, sincere religious beliefs.

25. Before HEI entered into the transaction with Unity House, he and HEI's entire Board of Directors went into prayer and fasting.

26. Following their prayer and fasting, Bobby Hanohano and the entire Board of Directors believed that they were led to go forward with the transaction with Norman Frank and Unity House.

27. In addition to the spiritual guidance the HEI Board and Bobby Hanohano obtained before deciding to proceed with the Unity House transaction, Peter Hanohano had advised Bobby Hanohano that Mr. Frank had been a successful developer in the past, and that information was useful to Bobby Hanohano in believing Mr. Frank and in deciding to proceed.

28. At all times, HEI's transaction with Unity House was an arms-length business transaction. HEI had legal counsel from attorney Burt Snyder in the transaction. Attorney Dennis Ing was available if the Hanohanos chose to use him.

29. Dennis Ing was the Hanohanos' family and business lawyer for 30 years.

30. Bobby Hanohano intentionally did not want Mr. Ing to be involved in the Unity House transaction. He believed at the time that Mr. Ing would counsel HEI not to proceed with the transaction because in Mr. Ing's view, it would be highly risky and imprudent. Bobby Hanohano consciously considered and

rejected that point of view.  In fact, Mr. Ing talked to and wrote Bobby Hanohano before the closing of the transaction with Unity House, advising that the Hanohanos should not enter into the Unity House transaction.  Bobby Hanohano rejected his advice, with knowledge of his concerns, and did so voluntarily and knowingly.

32.  Before entering into the transaction with Unity House in October 1997, Bobby Hanohano was specifically advised by Rudy Tam of Unity House that in its investigation of Mr. Frank and his associated corporations, Unity House had been unable to confirm representations made by Mr. Frank to Unity House, including but not limited to the existence and business purpose of Castel Corporation.

33.  Mr. Tam advised Bobby Hanohano prior to October 1997 that there was concern by Unity House because Mr. Frank's representations could not be confirmed.

34.  Before HEI entered into contracts with Unity House, Bobby Hanohano understood that Unity House had these concerns and understood that Unity House was suspicious of Mr. Frank.

35.  At no time did Bobby Hanohano or HEI rely on any statements made by Rudy Tam or Unity House in deciding to proceed with the Unity House loan. Bobby Hanohano testified that even if Unity House or Rudy Tam had told him "we think Mr. Frank

is an outright crook," or that Frank had prior or concurrent criminal law problems, such information would not have changed the decision to proceed with the transaction.  For the Hanohanos, the decision to go forward relied on spiritual guidance, not Unity House.

36.  Bobby Hanohano specifically recalls Tony Rutledge of Unity House asking him, before October 1997, "Are you sure you want to do this?"  Bobby Hanohano understood from this question that Mr. Rutledge might be suspicious or concerned because Unity House had done research on Mr. Frank and the companies involved and had not gotten the answers it looked for.

37.  Prior to October 1997, Unity House advised Bobby Hanohano that Mr. Frank was unable to produce a guarantee bond. However, Mr. Hanohano found that information irrelevant because the decision to go forward was based on spiritual principles.

38.  The Hanohanos entered into the Unity House transaction based on their own decisions and not in reliance on any statements made by Mr. Tam, Mr. Rutledge or Unity House. Nothing Unity House said or could have said would have altered the Hanohanos' decision to proceed.

39.  The Hanohanos understood that Unity House was seeking a return on its loan in excess of 100%, and freely and voluntarily decided to engage in the transaction, with no

duress, coercion or misrepresentations by Unity House, Inc.,
including the fact that the redemption price increased in the
context of the various option agreements.

40. Bobby Hanohano testified that he did not and does not
believe that Unity House acted unfairly or unreasonably, or that
Unity House engaged in fraud, misrepresentation or any other
misconduct with respect to HEI.

41. When the Hanohanos decided to proceed with Mr. Frank's
proposal, Bobby Hanohano fully understood, as did the HEI Board
of Directors, that there was a significant risk of loss to HEI.
In his capacity as President of HEI, he understood and accepted
this risk before the closing of the transaction with Unity House
occurred. He also understood, as did the HEI Board of
Directors, that there was a significant possibility of
substantial gain by HEI, in that its debts and obligations,
including the obligations to pay Unity House all of the amounts
in the various Option Agreements HEI entered into with Unity
House, would all be satisfied by funds from Mr. Frank's
companies. There was both significant risk and significant
reward from HEI's perspective.

42. In October 1997, Unity House and HEI, Vahey and HFI
entered into an agreement, whereby Unity House agreed to loan
HEI, Vahey and HFI $3,744,406.00. To secure payment of the

agreed-upon return on this loan, HEI, Vahey and HFI agreed to, and did, convey to Unity House, as collateral, title to certain property (the Property) located in Punaluu, expressly subject to a written option right/obligation of HEI, Vahey and HFI to redeem.

43. The Property includes essentially all of the parcels comprising a large tract of land that runs from the mountains to the ocean. The Property includes more property than just the land under the two condominium Associations' condominium projects. The parcels in the Transaction are specifically identified by the following Tax Map Key Numbers:

(1) 5-3-008-001 (subject to Hanohano Hale lease)

(1) 5-3-008-002 (subject to Pat's at Punaluu lease)

(1) 5-3-009-022 (vacant land)

(1) 5-3-009-023 (subject to Alii Care, Inc. lease)

(1) 5-3-009-024 (Mauka Lands)

(1) 5-3-009-058 (subject to The Ponds at Punaluu Assisted Living, Inc., lease)

44. As a part of the Transaction (including the two options), the Property was deeded to Unity House, but not all at the same time or by the same documents. The following conveyances were made:

(a) Warranty Deed executed by HEI and Vahey as grantors dated October 18, 1997, and recorded in the

12

Land Court, State of Hawaii, on October 27, 1997 as Document No. 2411208, which created Transfer Certificate of Title No. 499,772 [TMK Nos. (1) 5-3-008-001, subject to Hanohano Hale lease;(1) 5-3-009-023, subject to Alii Care, Inc. lease; and (1) 5-3-009-024, Mauka Lands];

(b)   Warranty Deed executed by Vahey only as grantor dated October 25, 1997, and recorded in the Land Court on October 27, 1997, as Document No. 2411209, which created Transfer Certificate of Title No. 499,773 [TMK No. (1) 5-3-009-022, vacant land];

(c)   Warranty Deed executed by Vahey only as grantor dated October 24, 1997 and recorded in the Land Court on October 29, 1997, as Document No. 2411644, which created Transfer Certificate of Title No. 499,893 [TMK No. (1) 5-3-008-002, subject to Pat's at Punaluu lease];

(d)   Warranty Deed executed by HEI and Vahey as grantor dated October 20, 1997, recorded in the Land Court on August 17, 1998, as Document No. 2478601, which created Transfer Certificate of Title 515,649 [TMK No. (1) 5-3-009-058 (subject to The Pond's at Punaluu Assisted Living, Inc., lease and other documentation]; and

(e)   Warranty Deed executed by HEI only as grantor dated May 6, 1998 recorded in the Land Court on May 15, 1998, as Document No. 2457398, which created Transfer Certificate of Title 510,103 [TMK No. (1) 5-3-008-002, subject to Pat's at Punaluu lease].

45.   The series of conveyances identified above were all subject to the option right/obligation of HEI, Vahey and HFI to redeem.   Unity House, as optionor, and HEI, HFI, and Vahey, as optionees, entered into an initial Option Agreement dated October 27, 1997 ("First Option Agreement") granting to Defendants a right to redeem.

13

46.    The First Option Agreement provided, among other things, for the amount of $8,200,000 to be paid to Unity House if Defendants exercised the option within 30 days of the date of the option agreement [i.e., by November 26,1997] and the amount of $8,700,000 to be paid if the option was exercised after the thirty-day period but no later than March 30, 1998.

47.    Appraisals dated January 12, 1999 by Stellmacher & Sadoyama, Ltd., of the leased fee interest in the lands under the Hanohano Hale and Pat's at Punaluu Condominiums estimated the respective market values at $3,904,000 and $3,180,000.

48.    The Transaction and the Option Agreement originally included certain property owned by the Hanohano Family known as the "Family Parcel."  The Transaction and the Option Agreement were amended by that certain unrecorded Amendment to Option Agreement dated October 29, 1997, by and between Unity House and the Hanohanos.  The Family Parcel was excluded and, instead, all of Vahey's right, title and interest (being a ½ interest) in the Pat's at Punaluu parcel was included in the Property and made subject to the Option Agreement.  (A Memorandum of Option Agreement giving notice of the Option Agreement, as amended, was recorded in the Land Court as Document No. 2411210 and noted on Transfer Certificate of Title No. 497384.)   Thus, the Option Agreement was, in effect, amended to substitute the collateral

14

securing the funds advanced.  The Option Agreement also required
the Optionees to exercise their options, or to convey additional
property to Unity House in the Transaction.

49.  More particularly, HEI and Vahey agreed that in the
event they were (1) unable to or elected not to exercise the
Option Agreement and (2) unable to satisfy all of the conditions
set forth in the Option Agreement, HEI and Vahey agreed to
convey to Unity House all of HEI's and Vahey's right, title and
interest in and to that parcel identified as TMK No. 5-3-9-58  –
i.e., the property subject to The Ponds at Punaluu Assisted
Living, Inc. lease.  This agreement is memorialized in the
"Option to Acquire Title to Lot 5" dated October 18, 1997.

50.  About a month after the First Option Agreement expired
(on March 30, 1998), Option Agreement II was entered into by and
between Unity House, HEI and Vahey on April 25, 1998.  Pursuant
to Option Agreement II (a) HEI's interest in the Pat's at
Punaluu parcel was added as collateral; (b) an additional
payment to Unity House of $100,000 was made; (c) new periods –
an Initial Option Period (April 25 - May 22, 1998) and an
Extended Option Period (May 23 - June 22, 1998) – within which
the option to repurchase could be exercised were agreed upon;
and (d) the redemption price with respect to the Initial Option

Period ($9,500,000) and the Extended Option Period ($10,500,000) were agreed upon.

51.  Both the Initial Option Period and the Extended Option Period in Option Agreement II expired without HEI and/or Vahey paying the respective repurchase price.  On August 17, 1998, the Warranty Deed conveying the parcel identified by TMK No. 5-3-9-58 (Ponds at Punaluu) to Unity House was recorded.

52.  It is clear from the face of these purchase and option documents, and it is undisputed by all of the parties to the Transaction, that the parties intended that HEI and Vahey would be able to, and were expected to, regain legal title (or retain legal title in the case of TMK No. 5-3-9-58) to the Property upon payment of the redemption price(s) agreed upon in the First Option Agreement and/or Option Agreement II.

53.  On March 19, 1999, the Association of Apartment Owners of Hanohano  Hale (Hanohano Hale AOAO) initiated Civil No. 99-1122-03 by filing a Complaint against Unity House, Incorporated, Hanohano Enterprises, Incorporated and Sarai Ann Kalai Hanohano Vahey as Defendants.  Thomas Watts filed the action on behalf of the Hanohano Hale AOAO.  In essence, the Complaint alleged that the transactions between the Hanohanos and Unity House were a sale, and that the conveyance violated the AOAO's rights under Chapter 514C Hawaii Revised Statutes to

have the first opportunity to buy the leased fee interest in the land under the AOAO building.

54.  On April 15, 1999, Unity House, Incorporated as Defendant filed an Answer to the Complaint, *inter alia*, denying its material allegations.  On April 20, 1999, Unity House filed a First Amended Answer.

55.  On April 29, 1999, Defendants HEI and Vahey answered the Hanohano Hale AOAO Complaint, also in pertinent part denying its material allegations.

56.  On July 2, 1999, Unity House, Incorporated as Plaintiff filed this foreclosure action, Civil No. 99-2545-07, naming as Defendants Hanohano Enterprises, Incorporated (HEI), The Hanohano  Family, Inc. (HFI) and Sarai Vahey.  The gravamen of the Complaint is that the transactions between Unity House and the Hanohanos amount to a loan and mortgage, that the Hanohanos are in default, and that Unity House is entitled to the usual foreclosure remedies.

57.  On August 27, 1999, the Hanohano Hale AOAO filed a Motion to Consolidate the two lawsuits, which was granted by Order dated November 16, 1999.

58.  On September 14, 1999, Defendants HEI, HFI and Vahey (the Hanohanos) filed an Answer to Unity House's foreclosure Complaint.  At that time, the Hanohanos were represented by

Dennis Ing.   In the Answer, the Hanohanos agreed with Unity House's assertion that the transactions between them constituted a loan and mortgage.   They also made several admissions, including but not limited to the following: 1) they entered into a transaction by which Unity House acquired title to the properties as described in the Complaint; 2) as part of the transaction, they were given the option to repurchase the title to those properties; 3) they executed the Option Agreements as listed in 7c (purchase price of $8,700,000.00 if option exercised no later than March 30, 1998) and 7d (purchase price amended to $10,500,000.00, additional property "Pat's Parcel" included, period to exercise right to pay purchase price extended-Option Agreement II) of the Complaint; and 4) they failed, refused and neglected to pay the Purchase Price under Option Agreement II.   The Answer also asserted the following affirmative defenses:   laches, equitable estoppel and/or unclean hands, waiver, estoppel, fraud, and misrepresentation.   The Answer did not assert the affirmative defense of unconscionability.

59.   On November 2, 1999, the Association of Apartment Owners of Pat's at Punaluu (Pat's AOAO) filed a Motion to Intervene in the now consolidated cases.   Pat's AOAO was represented by Myles Yamamoto.   The Motion to Intervene was

unopposed and an Order granting it was entered on January 4, 2000.

60.  On January 19, 2000, Pat's AOAO filed its Complaint, which mirrored the Complaint filed by the Hanohano Hale AOAO.

61.  On January 26, 2000, Unity House as Defendant answered Pat's AOAO's Complaint.

62.  On February 16, 2000, the Hanohano Defendants, through Dennis Ing, answered Pat's AOAO's Complaint.

63.  Subsequently, the two AOAOs and the Hanohanos entered into a Settlement Agreement.  As part of that Agreement, Mr. Watts and Mr. Yamamoto, counsel for the two AOAOs, became counsel for the Hanohanos as well, and subsequently entered appearances to that effect.  The Hanohanos and the AOAOs, which clearly had and have conflicting interests, purported to waive those conflicts.

64.  In 2001, the AOAOs and Unity House filed cross Motions for Summary Judgment on the issue of whether the transactions between the Hanohanos and Unity House were a sale or a loan and mortgage.  The briefing and argument was very extensive and thorough.

In its Motion for Partial Summary Judgment filed on August 14, 2001, Unity House asked the Court to determine that the transaction was a mortgage loan, to dismiss with prejudice

the claims of the two AOAOs and to enter judgment in favor of Unity House.

65. Judge Del Rosario granted Unity House's Motion and denied the AOAOs' motions and ruled that the transactions constituted a loan and mortgage, as alleged in the Unity House Foreclosure Complaint and as admitted and agreed to by the Hanohano Defendants.

66. In 2002, HEI as Defendant, through its new counsel in the foreclosure action, successfully moved the Court for leave to file a counterclaim against Unity House. The counterclaim was filed August 20, 2002. It affirmatively asserted claims of fraud, joint enterprise fraud (i.e., Unity House acting in concert with Norman Frank), breach of duty, breach of the implied covenant of good faith and fair dealing, and punitive damages.

67. Unity House moved for summary judgment on that Counterclaim, relying on the testimony of Bobby Hanohano, which contradicted the material allegations of the Counterclaim, and which was effectively uncontradicted. The Court granted Unity House's Motion for Summary Judgment on the Counterclaim by Order dated December 30, 2002.

CONCLUSIONS OF LAW

1.    If it should be determined that any of these
Conclusions of Law should have been set forth herein as Findings
of Fact, the Court so finds as to such matters.

2.    The above-entitled Court has jurisdiction over the
parties in, and the subject matter of, the instant action, and
venue is proper in the above-entitled court.

3.    Based upon the facts admitted in the Hanohanos' Answer
filed on September 14, 1999 and the granting of Unity House's
various motions for summary judgment, the only issues before the
Court are the redemption price and the time limit within which
the Hanohanos must pay the redemption price.  See Kawauchi v.
Tabata, 49 Haw 160, 170, 413 P.2d 221, 227 (1966) (quoting
Jones, Mortgages, s 301 (8th ed.) ("'When one borrows money upon
the security of his property, he is not allowed by any form of
words to preclude himself for redeeming.'")  Unity House argues
for the amount agreed to at arms-length by the parties to the
transaction ($10.5 million).  The Hanohanos argue that Unity
House is limited to the statutory (10%) rate of interest (see
Haw. Rev. Stat. Section 478-2 (2002)), or less, if the court
finds in Defendants' favor on the Defendants' defenses.

4.    Contrary to the proposition set forth in the
Hanohanos' Trial Memorandum, Judge Del Rosario's determination

21

that the transaction was a loan and mortgage did not constitute a reformation of the amended Option Agreement, nor did Unity House plead in its Complaint for reformation of the agreement. The determination, rather, was an interpretation or identification of the transaction in order to address the Complaint filed in Civ. No. 99-1122, Pat's AOAO's Complaint, HEI's Counterclaim filed in Civ. No. 99-2545, and the various Answers filed in Civ. No. 99-2545.

5.    A valid contract exists between Unity House and the Hanohanos.  It is not in dispute that Unity House entered into various agreements with the Hanohanos in which Unity House gave $3,744,406.00 to the Hanohanos in exchange for title to various tracts of land owned by the Hanohanos, which the Hanohanos had the option to repurchase according to certain specifications. Bobby Hanohano, as President of HEI, was authorized to sign the agreements and did so with the knowledge of Norman Frank's prior dealings with Unity House and the ongoing investigation of Mr. Frank.

6.    Courts enforce agreed-upon interest rates in this setting unless the contract is unconscionable.  See  Article: Rate Regulation at the Crossroads of Usury and Unconscionability: The Case for Regulating Abusive Commercial

and Consumer Interest Rates Under the Unconscionability
Standard, 31 Hous. L.Rev. 721 (Fall, 1994).

7.    Unconscionability is an affirmative legal defense. See
Flam v. Herrmann, 90 Misc.2d 434 (N.Y. 1977).

8.    Although the Hanohanos, in their Trial Memorandum,
mention unconscionability as one of the grounds for relief from
the redemption price stated in Option Agreement II, pursuant to
Hawaii Rules of Civil Procedure 8, affirmative defenses must be
set forth affirmatively in a pleading.  Defendants HEI, HFI and
Vahey failed to set forth unconscionability as an affirmative
defense in their Answer filed September 14, 1999 in Civil No.
99-2545-07.

9.    In addition, "[t]he standard of conduct contemplated
by the unconscionability clause is good faith, honesty in fact
and observance of fair dealing."  Kugler v. Romain, 58 N.J. 522,
544 (1971).  When Judge Del Rosario granted Unity House's Motion
for Summary Judgment on Count III ("Breach of the Implied
Covenant of Good Faith and Fair Dealing") of Defendant HEI's
Counterclaim filed 8/20/02, he in effect determined that
unconscionability was inapplicable to this case.

10.   Fraud and misrepresentation, likewise, were the
subject of summary judgment proceedings involving HEI's
Counterclaim.  In Count I (Fraud) of the Counterclaim, HEI

basically alleged that: 1) at the time Rutledge (Unity House) "signed the Purchase Offer, it knew that Hanohano and Vahey signed the Purchase Offer on the premise that Frank had arranged for financing which would enable him to provide the funds necessary to repurchase the property on the terms set forth in the First Option Agreement;" and 2) at the time Rutledge (Unity House) "signed the Purchase Agreement, Unity House knew or strongly suspected that that the financing arrangement . . . was a sham" (because Unity House had previously refused to loan money to Frank).  HEI also alleged that Unity House made misrepresentations to Bobby Hanohano by conveying the impression that Unity House's refusal to loan money to Frank was due to a legal or procedural technicality.

In Count II (Fraud), HEI alleged that Frank's actions were fraudulent and that Unity House acted in concert with Frank to commit fraud against the Hanohanos with the intent to benefit, thereby making Unity House vicariously liable for the actions of Frank.

When Judge Del Rosario granted Unity House's Motion for Summary Judgment of Defendant HEI's Counterclaim filed 8/20/02, he determined that there were no genuine issues of material fact regarding the Hanohanos' claims of fraud and misrepresentation, thus eliminating them as issues in the case.

11. As the Defendants did not file a motion under Rules 59 or 60, Hawaii Rules of Civil Procedure, seeking to alter, amend, reconsider or obtain relief from Judge Del Rosario's Order granting Unity House's Motion for Summary Judgment finding the transaction to be a loan and mortgage, or from his Order granting Unity House's Motion for Summary Judgment on HEI's Counterclaim, pursuant to Wong v City and County of Honolulu, 66 Haw. 389, 665 P.2d 157 (1983), this Court is bound by the decisions of the prior proceedings.

12.  In regard to the Hanohanos' claims of laches, equitable estoppel, waiver, estoppel and unclean hands, "the general principle is that equity will not take jurisdiction when the complainant has a complete and adequate remedy at law." Beneficial Hawaii, Inc. v. Kida, 96 Haw. 289, 312, 30 P.3d 895, 918 (2001) (quoting Henry Waterhouse Trust Co. v. King, 33 Haw. 1, 9 (1934)).  One of the exceptions to this rule, as noted by the Court in Beneficial, occurs "when the claim of the complainant is of an equitable nature and admits of a remedy in the court of equity only." Id.  Such is not the case here.

13.  Although the Hanohanos argue that Kawauchi v. Tabata, 49 Haw. 160, 413 P.2d 221 (1966) requires that statutory interest (10%) be used, this Court concludes that Kawauchi is inapplicable to this case, as Kawauchi dealt with the now-

25

repealed usury statute, making the contract in that case unenforceable and causing that court to look to the statutory rate of interest, since there was no contractual provision that it could honor.

14.   Hawaii Revised Statutes § 478-2 (2002) states in pertinent part that "[w]hen there is no express written contract fixing a different rate of interest, interest shall be allowed at the rate of ten per cent a year ...". Here, the parties did fix a different rate of interest in the written contracts.

15.   For the reasons set forth above, the redemption price is $10,258,694.12 ($10.5 million, less only the $241,305.88 surplus shown in UHI Exhibit 102).

16.   The Court therefore directs entry of judgment in favor of Unity House in Civ. No. 99-2545. Counsel for Unity House is to submit a proposed form of Final Judgment as soon as it is appropriate to do so.


DATED:   Honolulu, Hawaii


_____
BERT I. AYABE
Judge of the Above-entitled Court


26

ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, and good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

1.    Judgment shall enter in favor of Plaintiff Unity House, Incorporated and against Defendants Hanohano Enterprises, Incorporated, Sarai Ann Kalai Hanohano Vahey, and The Hanohano Family, Inc. as to all claims in Civ. No. 99-2545.

2.    The issue of the deadline for payment of the redemption price will be determined by the Court at a later date.

3.    Counsel for Plaintiff Unity House, Incorporated is respectfully requested to prepare an appropriate judgment in accordance with the foregoing.

DATED: Honolulu, Hawaii

_____
BERT I. AYABE
Judge of the Above-entitled Court

27

```
NOTICE SENT TO:

Thomas T. Watts
Grosvenor Center, Mauka Tower
737 Bishop Street, Suite 1455
Honolulu, Hawai'i 96813
     Attorney for AOAO Hanohano Hale, Hanohano Enterprises, Inc.,
     and Hanohano Family, Inc.
     Via Court Jacket

Myles T. Yamamoto
1000 Bishop Street, Suite 801
Honolulu, Hawai'i 96813
     Attorney for Hanohano Enterprises, Inc.,
     Hanohano Family, Inc. and Plaintiff Intervenor AOAO
     Apartment Owners of Pat's at Punaluu
     Via Court Jacket

Howard Glickstein
345 Queen Street, Second Floor
Honolulu, Hawai'i 96813
     Attorney for Unity House, Inc.
     Via Court Jacket

David J. Gierlach
Five Waterfront Plaza, Suite 330
500 Ala Moana Blvd.
Honolulu, Hawai'i 96813
     Attorney for Unity House, Inc.
     Via Court Jacket
```

## NOTICE OF ENTRY

The foregoing Findings of Fact, Conclusions of Law and Order in Unity House, Incorporated vs. Hanohano Enterprises, Incorporated, et al., Civ. No. 99-2545-07 (Circuit Court of the First Circuit, State of Hawaii) has been entered and copies thereof served on the above-identified parties by placing the same in their court jackets or placing the same in the U.S. Mail, postage prepaid on February 7, 2005.

Annette Honda
Clerk, Twenty-First Division